**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Joseph W. Desmond, being duly sworn, state:

1. I am a Special Agent of the United States Drug Enforcement Administration (the "DEA") and have been so employed for over twenty one years. I am currently assigned to the Boston field office and have been so assigned for the past seventeen years. As a DEA agent, I have participated in numerous investigations regarding narcotics distribution in the New England region and elsewhere. In addition to narcotics related charges, many of these cases have involved violations of federal and state laws relating to, among other offenses, murder, extortion, and firearms violations. I was the DEA case agent assigned to the so-called "Code of Silence" case. See United States v. Houlihan, Crim. No. 93-10291-WGY.

2. During the course of my career I have been involved in every facet of law enforcement investigations including the use of court authorized electronic surveillance, and the use of pen registers and consensual recordings. Further, I have supervised and participated in numerous physical surveillances of the activities of persons involved in narcotics related activity and controlled purchases of drugs. I have also supervised and participated in the execution of numerous search warrants on premises that have been the sites of narcotics related activity, and have reviewed records of drug trafficking seized in such

warrants. Finally, I have conducted and participated in hundreds of hours of debriefing cooperating witnesses and informants who have been engaged in or associated with drug trafficking.

3. This affidavit is submitted in support of an application for a criminal complaint charging JUAN RIVERA, A/K/A "PEDRO" and ALEXANDER GONZALEZ, A/K/A "LUIS" with conspiracy to possess with the intent to distribute and to distribute more than 100 grams of heroin, a Schedule II controlled substance, in violation of Title 21, United States Code sections 846 and 841(b)(1)(B).

4. Since April of this year, I, along with Special Agents and Task Force Agents assigned to the Task Force, have been investigating the criminal activities of JUAN RIVERA and ALEXANDER GONZALEZ and others. As a result of my personal participation in the investigation, interviews with and analysis of reports submitted by other law enforcement personnel, interviews of the co-operating witness ("CW-1") who assisted in making purchases described below, and my consultations with other law enforcement officers, I am familiar with this investigation. This Affidavit does not set forth every fact that I and other law enforcement agents know about this investigation, but simply sets forth the facts that I believe are sufficient to show probable cause necessary for the issuance of the requested criminal complaint.

2

5. This investigation was initiated in April, 2004 when CW-1 provided information about a individual (hereinafter referred to as the "source of supply" or "SOS") from whom CW-1 stated he/she could purchase heroin. CW-1 identified the SOS as an individual who sold heroin out of a business that the SOS operated in the Greater Boston Area. The investigation against the SOS is continuing.

6. CW-1 made two controlled purchases of heroin from the SOS prior to May 10, 2004. Both of these were controlled purchases made by CW-1. During both purchases, CW-1 wore recording equipment and a transmitter that allowed agents to listen to conversations as they took place. CW-1 was searched before and after each purchase, and surveillance was conducted by me and other agents.

7. During the second of these purchases (on May 6, 2004), the SOS stated that he/she had a new source of supply from whom he/she was purchasing heroin. The SOS indicated that this new source of supply could provide a higher quality of heroin at a better price. Based on these statements, CW-1 discussed with the SOS the purchase of finger quantities of heroin.[1]

8. The next day (May 7, 2004), CW-1 had further

---

[1] Based on my training and experience, I know that the term "finger" refers to an amount of heroin of between 7-10 grams often packaged in a cylindrical package of wax or some other substance that looks like a finger.

3

conversations with the SOS regarding the purchase of finger quantities of heroin. The SOS agreed to provide CW-1 with 40 grams of heroin on May 10, 2004 for $4,800.

9. I met with the CW-1 on May 10, 2004 for the purpose of making the heroin purchase from the SOS. The CW-1 was searched for money and contraband and provided with recording equipment and a transmitter. At approximately 2:00 p.m., CW-1 and I (posing as CW-1's customer) went to the McDonald's Restaurant located at the intersection of Massachusetts Avenue and Melnea Cass Blvd. in Boston to meet the SOS.

10. After CW-1 and I drove to the McDonald's, the SOS directed us by telephone to drive to a nearby pizza shop. There, the SOS got into my car and introduced him/herself. The SOS asked CW-1 for the money and I gave the SOS $4,800 in official advanced funds ("OAF"). The SOS then got into the back of a Honda that was parked nearby and which was occupied by two Hispanic males.

11. Several minutes later, the SOS got out of Honda with one of the Hispanic males, who came over and was introduced as "Luis" but who I later identified as ALEXANDER GONZALEZ. CW-1, the SOS, GONZALEZ and I then went into the pizza shop as the third man in the Honda drove off.

12. I waited in the pizza shop with GONZALEZ and the other two men for approximately 30 minutes. During that time, GONZALEZ

4

and the SOS had several conversations on the SOS's cellular telephone with the person who I understood was getting the heroin. After these conversations, the SOS stated that the heroin would be delivered shortly. GONZALEZ asked about purchasing stolen televisions.

13. The Honda drove up to the Pizza shop at approximately 2:40 p.m. At that time, I observed the driver to be the second Hispanic male who I later identified to be JUAN RIVERA. After RIVERA pulled up, the SOS told me to get in the Honda. CW-1 and I then got in the back seat.

14. After CW-1 and I got into the car, RIVERA displayed a plastic bag containing beige powder that subsequently field tested positive for heroin. RIVERA gave the bag to CW-1 who in turn handed it to me. RIVERA discussed the quality of his heroin and stated that he was interested in future business.

15. During the months of May and June of 2004, I made three additional controlled purchases of heroin with the assistance of CW-1. One additional buy involved the SOS and RIVERA, followed by two additional buys directly from RIVERA in the Boston area. During each of these transactions, CW-1 was searched in the manner described above and the conversations were recorded. GONZALEZ was not present at any of these purchases. Each of the substances obtained during the three controlled buys was field tested and the results were positive for heroin.

16. During the purchase conducted on June 23, 2004, RIVERA discussed delivering 100 grams of heroin in exchange for $10,000 to me and CW-1 on Cape Cod. RIVERA indicated that his source would accompany him in the source's vehicle because it had a hidden compartment to hold the heroin. RIVERA also inquired about the availability of stolen televisions.

17. On July 2, 2004 CW-1 and I contacted RIVERA and discussed the purchase of 100 grams of heroin for $10,000. I indicated that the stolen televisions wouldn't be available for a few weeks. We planned that the drug deal and a stolen television deal would occur at the same time.

18. On or about July 4, 2004, CW-1 was contacted by RIVERA who stated that he was prepared to buy the televisions.

19. On July 13, 2004 CW-1 again spoke with RIVERA and arranged for the purchase to take place on July 15, 2004 on Cape Cod. The plan called for CW-1 to call RIVERA on the morning of July 15, 2004 to finalize the time and location on Cape Cod to meet.

20. Following numerous telephone calls with RIVERA on July 15, 2004, RIVERA called CW-1 and stated that he just crossed over the Sagamore Bridge. RIVERA was directed to the Burger King at exit 6 on route 6.

21. Surveillance agents observed a male later identified as RIVERA in the passenger side of a vehicle that arrived into the

parking lot and proceeded to the rear of Burger King. I observed RIVERA walking in the parking lot coming from the restaurant.

22. RIVERA then came over to the vehicle that CW-1 and I were sitting in and got inside. I handed him the money and he counted it and handed it back to me. While seated in the vehicle, I asked RIVERA if the Hispanic male standing in front of Burger King, and wearing the black do-rag headpiece was with him. RIVERA denied knowing the Hispanic male. RIVERA left the vehicle and entered the Burger King. CW-1 and I went into Burger King and sat at the table and observed RIVERA in the dining area. I then observed GONZALEZ in the dining area. RIVERA then went to a pay telephone and appeared to be making a telephone call.

23. I saw GONZALEZ speaking on a cellular telephone at the same time that RIVERA was talking on the pay telephone. They both appeared to hang up their telephones concluding the call at the same time.

24. RIVERA again proceeded down a hallway towards the restroom out of my sight. He then re-appeared and walked to the food court and into a convenience store in that area. When RIVERA left the store, he looked at me and nodded to follow him to the hallway that leads to the restroom. CW-1 and I followed a short distance behind RIVERA into the men's restroom. I located RIVERA inside a closed stall of the restroom. Inside the stall,

RIVERA reached into a paper bag and handed me approximately 100 grams of suspected heroin in a clear plastic bag. I handed him the envelope containing the $10,000. RIVERA put the money into his waistband, and CW-1 and I departed from the restroom.

25. I waited outside of the restroom in order to see where RIVERA was going. I gave the pre-arranged signal to the back-up units that the deal was completed and waited at the door leading out of the restaurant. As I got to the door, the back-up units were placing GONZALEZ under arrest, removing him from a car nearby in the parking lot. I held the door open and waited as RIVERA began to exit Burger King. When he got to the threshold, and looked in the direction of the agents that were arresting GONZALEZ, RIVERA froze and attempted to head back into the restaurant. I moved him outside where he was placed under arrest.

26. RIVERA and GONZALEZ were transported to the DEA office located in Hyannis for booking. They both were advised of their Miranda rights. RIVERA elected to waive his rights spoke to Special Agents Christian Brackett and Brian Tomasetta. RIVERA wrote a statement indicating that he asked GONZALEZ for a ride to the Cape to look at some stolen televisions. GONZALEZ was nervous because he thought that the televisions were stolen. RIVERA claimed that GONZALEZ did not know about the drug deal and had no money to purchase televisions because he wanted to

look at them first. RIVERA admitted his involvement in the heroin sales. He provided information about his source of heroin for this transaction, as well as a different source that he used on the prior deals.

27. The agents conducted a search of the car where GONZALEZ was located. No contraband was recovered. A specially trained and experienced narcotics detecting dog also searched the car, with negative results. The substance contained in the plastic bag was field tested and the result was positive for heroin. The substance was weighed with the packaging materials which included several plastic bags and was approximately 100 grams.

28. While I was engaged in negotiating the deal with RIVERA, other agents were watching GONZALEZ. They reported that they saw RIVERA and GONZALEZ pull into the Burger King parking lot at approximately 2:50 p.m. GONZALEZ was driving. Before pulling the car into a parking space, GONZALEZ drove the car all around the parking lot in a manner consistent with counter surveillance. He then dropped RIVERA off and parked his car in a position where he could monitor the truck in which RIVERA and I were sitting to set up the deal. After sitting in the car for a few moments, he walked into the Burger King, came out, and spun the car around leaving his vehicle in a better position to observe RIVERA and I.

29. Surveillance agents continued to watch GONZALEZ as the

deal progressed. They reported that, after RIVERA counted the money and left the truck in which I was sitting, GONZALEZ motioned to RIVERA and pointed to the rear of the Burger King and then drove his car to that area and parked facing the gas station. GONZALEZ then got out of the car, and went into the restaurant through the side entrance near the bathroom. Moments later, GONZALEZ came back outside, walked back to the car, and reached into the passenger side door and pulled out a red package that looked like a foil-type bag used to package snack food. GONZALEZ carried the bag and walked back inside the restaurant.

30. Surveillance agents saw GONZALEZ come back out of the restaurant minutes later through another exit eating potato chips and holding the bag. He went back to the car and spun the car around so that it was facing out. Agents immediately approached the car and arrested GONZALEZ.

31. Based upon the foregoing, I submit there is probable cause to believe that RIVERA and GONZALEZ were conspiring together, and with other persons to possess with intent to

distribute, and to distribute more than 100 grams of heroin.

_____
Joseph W. Desmond
Special Agent
Drug Enforcement Administration

Sworn and subscribed to before me this 16th day of July, 2004.

_____
MARIANNE B. BOWLER
CHIEF UNITED STATES MAGISTRATE JUDGE